IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>MAURICE EUGENE SMITH,<br><br>*Defendant.* | Case No. 1:25-CR-73 |

FILED IN OPEN COURT
APR - 1 2025
CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

## STATEMENT OF FACTS

The United States and the defendant, Maurice Smith, agree that the facts set forth in the Criminal Information and below are true and accurate, and stipulate that had this matter gone to trial, the United States would have proven them beyond a reasonable doubt through admissible and credible evidence.

1. Between in and around 2022 and 2024, in the Eastern District of Virginia and elsewhere, the defendant did knowingly devise and intend to devise a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises; and transmitted and caused to be transmitted wire communications in interstate commerce, for the purpose of executing the scheme and artifice to defraud.

2. At all times relevant to the Criminal Information, the defendant resided in Atlanta, Georgia. From there, he operated a luxury travel company called EUGENE TORIKO LLC, which offered highly customized travel planning services to individual and institutional customers. The defendant employed at least two other travel agents as independent contractors to assist clients with planning trips and making bookings, including for flights, accommodations, excursions, and other travel-related experiences.

1

3. Beginning at least in September 2022, and continuing through November 2024, the defendant began to take money that customers of EUGENE TORIKO paid to the company for booking travel and convert it to his own personal use. The defendant did so by falsely representing that he would use clients' money to pay for their travel reservations—typically, airfare and accommodations—and then not actually paying to secure reservations that he or his employees booked.

4. For example, in and around September 2022, victim K.G. and her roommate worked with one of the defendant's independent-contractor agents, Agent 1, to book them a trip to Saint Lucia. K.G. and her roommate paid EUGENE TORIKO for the trip. The night before K.G. was scheduled to depart, she learned that EUGENE TORIKO had not used their money to pay for their room at the hotel, and they had no reservation. When K.G. and her roommate arrived in Saint Lucia, they had to pay for the hotel room out-of-pocket. The defendant assured K.G. that he would repay her, but he did not. Finally, K.G.'s credit card company reimbursed her approximately $1,857.28.

5. In and around September 2022, victim B.L. also worked with Agent 1 and began making payments to the defendant for a trip to Saint Lucia with his wife in July 2023, which cost a total of more than $4,800. B.L. made the final payment on the trip in March 2023. On the day that B.L. and his wife were supposed to travel to Saint Lucia, they learned that EUGENE TORIKO had not booked their flights and had not paid for any accommodations. The defendant called B.L. and assured him that B.L. would receive a full refund. Several months went by, and the defendant did not reimburse B.L. After B.L. threatened to sue the defendant, in April 2024, the defendant sent B.L. a cashier's check in the amount of $4,840.53, drawn on a JPMorgan Chase account in April 2024. This refund was funded by the payment of another customer of EUGENE TORIKO, as addressed below.

2

6. Also in and around September 2022, victim T.B. and her husband booked a trip to Punta Cana, Dominican Republic, through EUGENE TORIKO, to travel in July 2023 along with her cousin. In the months that followed, victim T.B. paid approximately $3,000 to the defendant for the cost of the resort and transportation to and from the airport. When T.B. and her husband arrived at the resort, they learned that EUGENE TORIKO had not paid for their accommodations. In order to expedite their check-in, T.B. and her husband offered to pay the cost of the hotel room out-of-pocket, and have the defendant reimburse them. After T.B. complained about EUGENE TORIKO online, the defendant reimbursed her approximately $2,330.

7. In October 2022, victim J.G.G. paid EUGENE TORIKO approximately $4,220 to reserve accommodations for her and her husband at a resort in Saint Lucia in July 2023. When J.G.G. and her husband arrived, they learned that the defendant had never paid for the room, so they had to pay an additional $3,246.75 out-of-pocket. When J.G.G. informed the defendant of the issue, he told her that he would refund her the additional out-of-pocket amount, but he never did. Eventually, J.G.G.'s credit card company reimbursed the $3,246.75.

8. In and around the summer of 2023, victim J.F. paid the defendant $15,620.37 to book a trip for herself and her immediate family to travel to Guatemala in December 2023. Days before J.F. and her family were to depart, the defendant and J.F. scheduled a virtual meeting in which the defendant advised her of dangerous conditions in Guatemala and current travel advisories. J J.F. indicated to the defendant that she had purchased travel insurance and would be reimbursed if she decided to cancel. J.F. heeded the defendant's advice and agreed to rebook another trip through EUGENE TORIKO later; however, J.F. realized that she did not have travel insurance and the defendant did not return J.F.'s money for her canceled trip and stopped responding to her calls and emails. Rather than booking the Guatemala trip, the defendant used

J.F.'s funds to pay for hotels and meals in Kenya, airfare and travel credits not attributed to J.R.'s trip, and $8,182 paid to an Italian wine tour operator.

9. In and around the summer of 2023, the men's baseball team of Reinhardt University ("Reinhardt") paid EUGENE TORIKO to book travel for the team to Shreveport, Louisiana, for a tournament. Reinhardt's executive director of athletics, victim J.P., had been the defendant's college roommate. By late February 2024, Reinhardt had not received any airline confirmations. When J.P. asked the defendant about the missing airline reservations, the defendant told J.P. that he did not know what happened. In reality, the defendant did not use Reinhardt's money to pay for airline tickets. The baseball team took a bus to Shreveport. Eventually, the defendant repaid Reinhardt via two checks: one from JPMorgan Chase and one from Navy Federal Credit Union. These refunds were funded by the payments of other customers of EUGENE TORIKO, as addressed below.

10. J.P. also paid EUGENE TORIKO to book a personal trip for J.P. and his wife to the Bahamas, including accommodations at the Baha Mar resort. When J.P. and his wife arrived at the Baha Mar, they learned that the defendant had never paid for their reservations, and they had to pay for the hotel out-of-pocket.

11. In and around early 2024, the international studies department of Georgia Gwinnett College ("GGC") used EUGENE TORIKO to book a trip to Thailand for faculty and students, departing on June 8, 2024. On February 28, 2024, GGC paid the defendant nearly $34,000 to arrange the travel. Between May 30 and June 8, 2024, EUGENE TORIKO purchased one-way airline tickets totaling approximately $29,475.20, for GGC's Thailand travel group. On or around June 29, 2024, EUGENE TORIKO purchased one return ticket for $1,236.40, bringing the total to $30,711.60. After the GGC faculty and students were already in Thailand, they realized that the defendant had only purchased one-way tickets for nearly everyone. The faculty and parents of

4

students had to pay for their return tickets out-of-pocket, and GGC reimbursed this loss. GGC demanded EUGENE TORIKO repay approximately $20,000. The defendant asked the school to provide receipts for the $20,000 request but never received it. The defendant had no further communications with GCC.

12. Victims S.S. and H.H. used EUGENE TORIKO to book a Norwegian Cruise Line ("NCL") cruise to Hawaii during the summer of 2024. S.S. and H.H., along with a group of five or six others, each paid the defendant well in advance for the cruise, travel insurance, airfare, and hotel. S.S. had to cancel her trip due to her husband's illness and reached out to the defendant to do so. The defendant did not respond until S.S. complained about EUGENE TORIKO online. After the defendant did not refund S.S.'s $6,638.07, S.S.'s travel insurance company did.

13. H.H. tried to verify her reservations, but when she viewed the itinerary the defendant provided to her, none of the confirmation or booking numbers were legitimate. H.H. attempted to confirm her travel arrangements by calling NCL and the airline; however, they told her that the confirmation numbers were wrong, or not associated with her. NCL confirmed that they had no reservation on file. H.H. asked the defendant for a refund. Eventually, the defendant repaid H.H. via two Zelle payments: one for $5,000 and the other for $2,296.07. These refunds were funded by the payment of another customer of EUGENE TORIKO, as addressed below.

14. In and around June 2023, representatives from the George Mason University ("GMU") men's basketball team contracted with COMPANY A—a sports event marketing firm—about organizing a foreign tour for the team. COMPANY A's owner, Individual 1, knew the defendant through a mutual acquaintance and contacted the defendant about making the travel arrangements for the basketball team to travel to the Bahamas in August 2024.

15. In the months that followed, the defendant worked with Individual 1 to come up with cost estimates and draft itineraries for a five-day trip to the Bahamas. These were presented

to officials at GMU and George Mason University Foundation ("GMUF"). Individual 1 frequently related information that the defendant provided to him about the trip's cost and itinerary to GMU. Additionally, the defendant reviewed and edited the contract that COMPANY A provided to GMU as to costs and updated pricing.

16. On or about April 3, 2024, representatives from GMU, GMUF, and COMPANY A digitally signed a contract related to GMU's men's basketball team's trip to the Bahamas, which was scheduled for August 8 through August 12, 2024. Although EUGENE TORIKO was supposed to handle all travel arrangements—and the defendant himself reviewed and edited the contract at the request of COMPANY A—neither the defendant nor EUGENE TORIKO were mentioned in the contract.

17. Per the contract, COMPANY A was to provide the following, although COMPANY A was relying on EUGENE TORIKO LLC for most of these services:

   a. round trip airfare for traveling parties through a direct flight from Fairfax, Virginia, to Nassau, Bahamas;

   b. ground transportation by charter bus during the Foreign Tour including from and to the Bahamas airport, games, experiences, tournament-provided practices and hotel;

   c. hotel stays with double occupancy; single occupancy where indicated;

   d. daily breakfast at hotel and lunch on tournament days;

   e. sightseeing to a minimum of two (2) destinations;

   f. two (2) games to be played in the Bahamas;

   g. operational services fee (court rental, etc.)

   h. sanctioning fees on behalf of School with USA basketball and foreign basketball federations; and,

   i. a COMPANY A escort to accompany the School during duration of the tour.

18. On or about April 17, 2024, GMUF sent a wire transfer in the amount of $55,914.60 to COMPANY A. Two days later, the defendant invoiced COMPANY A for the services that EUGENE TORIKO was supposedly arranging for the GMU men's basketball foreign tour, including flights, ground transportation, accommodations at the Baha Mar resort, and breakfast. Based on this invoice, on April 24, 2024, COMPANY A wired the defendant $40,800 in funds received from GMU.

19. On or about May 20, 2024, the defendant sent another invoice to COMPANY A for the balance owed ($103,841). Based on the information in that invoice, COMPANY A then invoiced GMUF for the remaining amount. On May 23, 2024, GMUF sent a wire transfer in the amount of $103,841 to COMPANY A. Using the funds received from GMUF, COMPANY A then paid EUGENE TORIKO $57,736.07 in cash on May 29, 2024, and the remaining balance of $11,220 was paid via credit card on June 10, 2024. The credit card company later reimbursed COMPANY A for the $11,220.

20. All total, COMPANY A paid EUGENE TORIKO the entire amount of the above invoice, $109,756.07, using funds paid by GMUF. Additional family members, friends, and supporters of the GMU men's basketball student-athletes also paid COMPANY A and EUGENE TORIKO to accompany the team on their trip to the Bahamas.

21. Although the defendant reserved seats on flights from Virginia to the Bahamas and reserved a block of rooms at the Baha Mar, he spent $0 to secure either the flights or hotel rooms. As a result, the Baha Mar and the airline canceled the reservations. The defendant made no payments toward any legitimate cost associated with the trip.

22. Instead, the defendant used GMU's and GMUF's money in part to pay for his own personal travel. This included airfare, hotel accommodations, and/or meals for a trip to Tulum, Mexico in May 2024, and a trip to Panama City, Panama, in June 2024. Financial records show

7

the defendant's use of GMU funds for apparent personal gain totaled at least $34,000, including this personal travel as well as ATM withdrawals of approximately $12,000, plus many charges for dining out, retail, and sports betting sites.

23. Additionally, the defendant used GMU's and GMUF's money to refund other victims from whom he had stolen money. For example, the defendant used money received from GMU/GMUF for the cashier's check paid to Reinhardt, to refund them for the baseball team's trip to Shreveport. The defendant used this money for a cashier's check to B.L., to refund B.L. and his wife for their trip to Saint Lucia. The defendant also used this money to fund the two Zelle payments to H.H., to refund her for the NCL cruise to Hawaii that he never booked.

24. In September 2024, the defendant issued a letter via Individual 1 to GMU in which he falsely blamed a "logistical error" for the foreign tour falling through. The defendant did so because Individual 1 pressured him to make a statement to GMU. When the defendant was interviewed by law enforcement, the defendant stated that his professional liability insurance would reimburse GMU and GMUF; in fact, the defendant was not carrying professional liability insurance at the time, only general liability insurance.

25. In August 2024, victim J.L. used EUGENE TORIKO to arrange a January 2025 trip to Cancun, Mexico, for him and his girlfriend, including a hotel and airfare. Altogether, the defendant quoted J.L. a total of $9,405.80 for the trip, which included airfare and lodging at the Hotel Xcaret. Between August and November 2024, J.L. authorized multiple payments totaling $9,405.80 to cover the cost of the trip.

26. On or about October 19, 2024, an unauthorized charge of $4,702.90 was made from J.L.'s credit card to EUGENE TORIKO. J.L. contacted the defendant to dispute the charge. The defendant responded to confirm that the charge was an "error" on the part of EUGENE TORIKO and stated that he was "reversing the payment to be credited back to the [credit card]." The

unauthorized charge, however, was not reversed. J.L. had to seek reimbursement from the credit card companies via the dispute process.

27. Thereafter, J.L. learned that the defendant had not used any of J.L.'s money to purchase airline tickets for J.L. and his girlfriend, nor had the defendant booked their accommodations at the Hotel Xcaret. Financial records show that rather than booking the Cancun trip, the defendant used J.L.'s funds for small refunds to other victims, and for travel reservations for such destinations as Panama and the United Kingdom. However, most was used for the defendant's apparent personal gain of at least $8,000, including over $2,500 to sports betting sites, plus many charges for dining out, retail, and the purchase of at least $1,785 in money orders.

28. Altogether, the defendant caused a loss, or intended to cause a loss, of at least $150,000 but not more than $250,000.

29. This statement of facts includes those facts necessary to support the plea agreement between the defendant and the United States. It does not include each and every fact known to defendant or to the United States, and it is not intended to be a full enumeration of all of the facts surrounding defendant's case.

30. The actions of defendant, as recounted above, were in all respects knowing and deliberate, and were not committed by mistake, accident, or other innocent reason.

Respectfully submitted,

Erik S. Siebert
United States Attorney

Date: Apr 1, 2025    By: /s/ Katherine Rumbaugh
Katherine E. Rumbaugh
Christopher J. Hood
Assistant United States Attorneys

After consulting with my attorney and pursuant to the plea agreement entered into this day between the defendant and the United States, I hereby stipulate that the above Statement of Facts is true and accurate, and that had the matter proceeded to trial, the United States would have proved the same beyond a reasonable doubt.

_____
Maurice Smith
Defendant

I am the attorney for the defendant. I have carefully reviewed the above Statement of Facts with him. To my knowledge, his decision to stipulate to these facts is an informed and voluntary one.

_____
Courtney Dixon
Attorney for Defendant